**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SHELDON BATTLES

         Plaintiff,

v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY,

         Defendant.

No. 16-cv-1655 (EGS)

<u>**MEMORANDUM OPINION**</u>

Plaintiff Sheldon Battles ("Mr. Battles"), proceeding *pro se*, brings this action against defendant Washington Metropolitan Area Transit Authority ("WMATA"), arising out of the termination of his employment. In November 2015, WMATA terminated Mr. Battles from his supervisory position as Assistant Superintendent of Bus Service Operations at the West Ox Bus Division after determining that he violated: (1) WMATA's Nepotism/Favoritism Policy for engaging in a consensual sexual relationship with a female subordinate; and (2) WMATA's Sexual Harassment Policy for inappropriate conduct with a female employee in 2009. An internal investigation revealed that two other female subordinates accused him of sexual harassment in 2015. While he denies those allegations, Mr. Battles admits to engaging in a consensual sexual relationship with a female

subordinate. He contends that his termination was both false and pretextual.

Pending before the Court are the parties' cross-motions for summary judgment. Upon careful consideration of the parties' submissions, the applicable law, and the entire record herein, the Court concludes that there are no material facts in dispute, and WMATA lawfully terminated Mr. Battles for cause. Therefore, the Court **GRANTS** WMATA's motion for summary judgment and **DENIES** Mr. Battles' cross-motion for summary judgment.

## I. Background

The material facts in this case are undisputed. *See, e.g.*, Def.'s Statement of Material Facts ("SOMF"), ECF No. 33-1 at 1-3; Pl.'s SOMF, ECF No. 34 at 9-11; Def.'s Reply to Pl.'s SOMF, ECF No. 38-1 at 1-4.[1] The Court will only refer to those facts as necessary to resolve the cross-motions because the Court assumes the parties' familiarity with the factual background and procedural history. The Court summarized the factual allegations in this case in greater detail in its prior opinion. *See Battles v. Wash. Metro. Area Transit Auth.*, 272 F. Supp. 3d 5 (D.D.C. 2017).

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

## A. Factual Background

Between 2007 and 2015, Mr. Battles earned a series of promotions at WMATA. Compl., ECF No. 1 ¶ 8. He became Assistant Superintendent of Bus Services Operations in the West Ox Bus Division on March 22, 2015. Def.'s SOMF, ECF No. 33-1 at 1 ¶ 1. He served in that supervisory position for more than eight months. *Id*. In that role, Mr. Battles supervised Rhonda Gaines-Kelsey, a female employee. *See* Compl., ECF No. 1 ¶¶ 9, 16-17. Beginning in May 2015 and ending in July 2015, Mr. Battles and Ms. Gaines-Kelsey engaged in a consensual sexual relationship. *See* Investigative Report, ECF No. 33-9 at 2, 6. During the two-month long relationship, they exchanged nude pictures. *Id.* at 6.

At some point in September 2015 or October 2015, Mr. Battles imposed a five-day suspension on Ms. Gaines-Kelsey because she violated WMATA's Absenteeism Policy. *Id.* On October 1, 2015, Ms. Gaines-Kelsey lodged an internal complaint of sexual harassment against him in WMATA's Office of Civil Rights, alleging that Mr. Battles retaliated against her after she refused to welcome his advances. Def.'s SOMF, ECF No. 33-1 ¶ 6; *see also* Gaines-Kelsey's Formal Compl., ECF No. 33-8 at 2-3. Soon thereafter, WMATA's Office of Equal Employment Opportunity ("OEEO") conducted an investigation into Ms. Gaines-Kelsey's allegations, and the OEEO investigator, Devin Walker, interviewed Mr. Battles, Ms. Gaines-Kelsey, and seven other

WMATA employees, including Antoinette White and Renee Duren.
Def.'s SOMF, ECF No. 33-1 ¶ 7.

On November 9, 2015, the OEEO investigator issued a seven-page investigative report, finding that "[t]here [was] insufficient evidence to support a probable cause finding of sexual harassment in [Ms. Gaines-Kelsey's] complaint." Investigative Report, ECF No. 33-9 at 6. In fact, Ms. Gaines-Kelsey admitted that her sexual relationship with Mr. Battles was consensual, and she "welcome[d] the receipt of the nude, sexual picture from Mr. Battles[.]" *Id.* The report also found that Ms. Gaines-Kelsey's five-day suspension was warranted. *Id.*

The investigation, however, revealed that Ms. White and Ms. Duren accused Mr. Battles of sexual harassment. *Id.* at 4-5, 7. The report stated that those "two female Bus Operators . . . alleged that they were regularly subjected to sexual propositions and personal compliments from Mr. Battles." *Id.* at 7. The investigation also revealed another incident:

> [T]he evidence shows that on February 23, 2009, OEEO found that Mr. Battles, who was a Street Supervisor at that time, violated WMATA's Sexual Harassment policy when *he asked a female employee what type of underwear she was wearing.* OEEO recommended that Mr. Battles be suspended for two days for his actions and to register for WMATA's Sexual Harassment Training course.

*Id.* (emphasis added). The OEEO investigator forwarded the findings regarding the sexual relationship between Mr. Battles

4

and Ms. Gaines-Kelsey to Robert Potts, Acting Assistant General Manager, with a recommendation that "appropriate disciplinary action be taken against Mr. Battles for engaging in an inappropriate, personal relationship with [a female subordinate] of a sexual nature." *Id.*

Mr. Battles received a letter, dated November 10, 2015, from the OEEO informing him that the investigation found that "[t]here was insufficient evidence to support a probable cause finding of sexual harassment in [Ms. Gaines-Kelsey's] complaint." Pl.'s Ex. 1, ECF No. 34-1 at 1. As stated in the letter, the evidence showed that his personal relationship with Ms. Gaines-Kelsey was "inconsistent with WMATA's Policy/Instruction 7.8.2 'Nepotism/Favoritism,' Section 5.01 and 5.02." *Id.* The letter explained that Mr. Battles, who was in a "supervisory position," "demonstrated poor judgment by engaging in an inappropriate, personal relationship of a sexual nature[.]" *Id.* at 2-3. The letter informed him of the sexual harassment allegations made by Ms. White and Ms. Duren, and the OEEO's findings regarding his sexual relationship with Ms. Gaines-Kelsey were being forwarded to Mr. Potts. *Id.*

On November 27, 2015, WMATA terminated Mr. Battles. *E.g.*, Def.'s SOMF, ECF No. 33-1 ¶ 11; Pl.'s SOMF, ECF No. 34 ¶ 10. The termination letter explicitly cited Mr. Battles' violation of WMATA's Sexual Harassment Policy as to the sexual harassment of

a female employee in 2009, and his violation of WMATA's Nepotism/Favoritism Policy as to his sexual relationship with Ms. Gaines-Kelsey. Letter from Summon Cannon, Superintendent, West Ox Division, to Mr. Battles (Nov. 27, 2015), ECF No. 33-3 at 1-2 (hereinafter "Term. Ltr.").

On December 16, 2015, Mr. Battles challenged his termination through WMATA's grievance process by filing an Employee Dispute Resolution Adverse Action Grievance to the Department of Human Resources pursuant to WMATA's Policy/Instruction 7.3.4 (the "Employee Dispute Resolution Policy") and WMATA's Policy/Instruction 7.8.5 (the "Disciplinary Actions Policy"). *See, e.g.*, Battles' Grievance, ECF No. 33-10 at 1-10; Letter from Tawnya Moore-McGee, Chief Human Res. Officer, to Battles (Jan. 21, 2016), ECF No. 33-11 at 1; Disciplinary Actions Policy, ECF No. 33-6 at 4 (referencing the Employee Dispute Resolution Policy); Employee Dispute Resolution Policy, ECF No. 33-7 at 1-6.

To review, investigate, and respond to Mr. Battles' grievance, WMATA appointed a reviewing officer, Shiva K. Pant, on January 21, 2016. Def.'s SOMF, ECF No. 33-1 ¶ 13. The reviewing officer upheld WMATA's termination decision because, *inter alia*: (1) Mr. Battles' sexual relationship with Ms. Gaines-Kelsey was "unacceptable for an individual in a supervisory position"; (2) "[p]rior sexual harassment

allegations . . . were acknowledged by Mr. Battles";

(3) "Mr. Battles was found to be in violation of [WMATA's]

Nepotism/Favoritism Policy"; and (4) he "had earlier also been

found to be in violation of WMATA's Sexual Harassment Policy."

Mem. from Shiva Pant to Tawnya Moore-McGee, Chief Human Res.

Officer (Feb. 19, 2016), ECF No. 33-12 at 1.

### B. Procedural History

On August 16, 2016, Mr. Battles filed this action against

WMATA and two of its employees, Summon Cannon and Devin Walker

(the "Individual Defendants"), asserting claims for wrongful

termination (breach of contract), wrongful termination in

violation of public policy, defamation, intentional infliction

of emotional distress, and negligent infliction of emotional

distress. *See generally* Compl., ECF No. 1.[2] On September 28,

2017, this Court granted the Individual Defendants' motion to

dismiss. *Battles*, 272 F. Supp. 3d at 17. *Id.* The Court granted

in part and denied in part WMATA's motion to dismiss the

complaint. *Id.* In doing so, this action proceeded against WMATA

---

[2] Mr. Battles filed an amended complaint on April 24, 2017
without WMATA's written consent or leave of the Court. *See
generally* Am. Compl., ECF No. 19; *see also* WMATA's Mot. to
Dismiss, ECF No. 22 at 1 (citing Fed. R. Civ. P. 15). WMATA and
the Individual Defendants moved to dismiss the amended
complaint. *See* Individual Defs.' Mot. to Dismiss, ECF No. 21;
*see also* WMATA's Mot. to Dismiss, ECF No. 22 at 1. On September
28, 2017, the Court denied both motions as moot. *Battles*, 272 F.
Supp. 3d at 17.

as the sole defendant. *Id.* The remaining claim was Mr. Battles'
wrongful-termination (breach of contract) claim. *Id.* Thereafter,
the parties filed cross-motions for summary judgment. Those
motions are ripe and ready for the Court's adjudication.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, "[t]he court
shall grant summary judgment if the movant shows that there is
no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);
*see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In
ruling on cross-motions for summary judgment, the court shall
grant summary judgment only if one of the moving parties is
entitled to judgment as a matter of law upon material facts that
are not genuinely disputed. *See Citizens for Responsibility &
Ethics in Wash. v. U.S. Dep't of Justice*, 658 F. Supp. 2d 217,
224 (D.D.C. 2009) (citation omitted). Summary judgment will be
granted, therefore, if the plaintiff fails to submit evidence
that creates a genuine factual dispute or entitlement to
judgment as a matter of law. *Adair v. Solis*, 742 F. Supp. 2d 40,
50 (D.D.C. 2010), *aff'd*, 473 F. App'x 1 (D.C. Cir. 2012).

## III. Analysis

The Court begins with the issue of whether there was an
implied employment contract between Mr. Battles and WMATA based
on the relevant policies, and then concludes that the parties'

cross-motions present no genuinely disputed material facts that
would preclude a grant of summary judgment in this case.

### A. The Relevant WMATA Policies Created an Implied Employment Contract Between Mr. Battles and WMATA

Mr. Battles' remaining claim is a wrongful-termination
(breach of contract) cause of action, which is predicated on the
existence of an implied employment contract. *See* Compl., ECF No.
1 ¶¶ 26-31.[3] He bears the burden of proving the necessary
elements of a breach of contract: "(1) a valid contract between
the parties; (2) an obligation or duty arising out of the
contract; (3) a breach of that duty; and (4) damages caused by
the breach." *Mesumbe v. Howard Univ.*, 706 F. Supp. 2d 86, 94
(D.D.C. 2010) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d
181, 187 (D.C. 2009)); *see also Donovan v. U.S. Postal Serv.*,
530 F. Supp. 872, 890 (D.D.C. 1981) ("[T]he elements of an
express and an implied contract are the same." (citation
omitted)). For the reasons stated below, the Court agrees that
there was an implied contract between Mr. Battles and WMATA, but

---

[3] The parties do not indicate the governing law in this action.
*See generally* Def.'s Mot. for Summ. J. ("Def.'s MSJ"), ECF No.
33; Pl.'s Resp. & Mot. for Summ. J. ("Pl.'s MSJ"), ECF No. 34;
Def.'s Reply, ECF No. 38. The Court will apply District of
Columbia law to Mr. Battles' breach of contract claim. *See
Republican Nat. Comm. v. Taylor*, 299 F.3d 887, 891 (D.C. Cir.
2002) ("[C]ourts generally apply the law of the jurisdiction in
which they sit."); *see also Robinson v. Wash. Metro. Area
Transit Auth.*, 167 F. Supp. 3d 118, 129 (D.D.C. 2016) (applying
District of Columbia law to breach of contract claims).

Mr. Battles has failed to prove that WMATA breached its obligations.

"Under District of Columbia law, in the absence of an express contract, a court may imply a contract from the course of the parties' conduct." *Grunseth v. Marriott Corp.*, 872 F. Supp. 1069, 1073 (D.D.C. 1995), *aff'd*, 79 F.3d 169 (D.C. Cir. 1996). "[A]n implied contract may arise from the language of an employee handbook or manual[.]" *Smith v. Union Labor Life Ins. Co.*, 620 A.2d 265, 269 (D.C. 1993); *see also Strass v. Kaiser Found. Health Plan of Mid-Atl.*, 744 A.2d 1000, 1011 (D.C. 2000) (recognizing that "contractual rights may arise from language in employee manuals."). Thus, "like any District of Columbia employer WMATA can bind itself contractually in a personnel manual[.]" *Beebe v. Wash. Metro. Area Transit Auth.*, 129 F.3d 1283, 1290 (D.C. Cir. 1997).[4]

---

[4] WMATA does not assert a sovereign immunity defense as to Mr. Battles' breach of contract claim—a defense that can be traced to WMATA's creation. *See generally* Def.'s MSJ, ECF No. 33; Def.'s Reply, ECF No. 38. WMATA was established by virtue of the Compact signed by Maryland, Virginia and the District of Columbia, and agreed upon by Congress (the "Compact"). D.C. Code § 9-1107.01; *see also Watters v. Wash. Metro. Area Transit Auth.,* 295 F.3d 36, 39 (D.C. Cir. 2002). Congress and the Compact's individual signatories have conferred on WMATA the same Eleventh Amendment sovereign immunity that each individual signatory enjoys. *Lucero-Nelson v. Wash. Metro. Area Transit Auth.*, 1 F. Supp. 2d 1, 10 (D.D.C. 1998). This immunity applies except where expressly waived by statute, *id.*, and Section 80 of the Compact, partially waives WMATA's Eleventh Amendment immunity. D.C. Code § 9-1107.01(80). "Section 80 expressly provides for direct actions where WMATA is charged with a tort

"For an enforceable contract to exist, there must be both
(1) agreement as to all material terms; and (2) intention of the
parties to be bound." *Georgetown Entm't Corp. v. District of
Columbia*, 496 A.2d 587, 590 (D.C. 1985). Here, the parties do
not dispute the existence of an implied contract. *See generally*
Def.'s MSJ, ECF No. 33; Pl.'s MSJ, ECF No. 34; Def.'s Reply, ECF
No. 38. Neither do they dispute that Mr. Battles' claim is
premised on an implied employment contract between him and WMATA
that appears to be inferred from the language of the relevant
policies, including WMATA's Employee Dispute Resolution Policy
and its Disciplinary Actions Policy. *See* Def.'s MSJ, ECF No. 33
at 1, 5-6; *see also* Pl.'s MSJ, ECF No. 34 at 5.

Because the issue of "[w]hether a contract exists is a
question of law for the Court to resolve[,]" *Dawson v. Wash.
Metro. Area Transit Auth.*, 256 F. Supp. 3d 30, 33 (D.D.C. 2017),
the Court next analyzes the plain language of WMATA's policies
to determine whether those policies created an implied contract
between Mr. Battles and WMATA. *Id.* at 35 (evaluating the plain
language of certain policies to determine the existence of a
contract).

---

or a *breach* of its contracts[.]" *Queen v. Wash. Metro. Area
Transit Auth.*, 901 F.2d 135, 138 (D.C. Cir. 1990) (emphasis in
original); *see also Martin v. Wash. Metro. Area Transit Auth.*,
273 F. Supp. 2d 114, 119 (D.D.C. 2003) (defense of sovereign
immunity was inapplicable to plaintiff's breach of contract
claim).

1.     **Relevant Policies Pertaining to Termination**

At the time of Mr. Battles' employment, certain policies governed disciplinary actions, termination, and the employee dispute resolution process. *See, e.g.*, Def.'s MSJ, ECF No. 33 at 6; Def.'s SOMF, ECF No. 33-1 ¶¶ 2-5; Pl.'s SOMF, ECF No. 34 ¶¶ 2-4, 11. Under Section 5.01 of WMATA's Policy/Instruction 7.2.1/1 ("Policy 7.2.1/1"), WMATA was "not obligated to guarantee continued employment under any circumstances." Policy 7.2.1/1, ECF No. 33-13 at 3, § 5.01. It also provided that "*Regular Employees may be dismissed only for cause*." *Id.* (emphasis added). "Cause for dismissal include[d], but [was] not limited to, job performance and/or *conduct* by an Employee which [was] *less than satisfactory*." Policy 7.2.1/1, ECF No. 33-13 at 3, § 5.01 (emphasis added).[5]

2.     **Disciplinary Actions Policy**

As outlined in WMATA's Disciplinary Actions Policy, a regular employee, like Mr. Battles, was subjected to certain disciplinary actions if his "job performance and/or *conduct* may be *less than full satisfactory*." Disciplinary Actions Policy,

_____

[5] A "Regular Employee" was defined as "an Employee hired by [WMATA] to work on a regular basis for no specific duration and is entitled to certain [WMATA] benefits as indicted below." Policy 7.2.1/1, ECF No. 33-13 at 1, § 3.02. In this case, WMATA has conceded that Mr. Battles qualified as a regular employee rather than an "at-will" employee; therefore, his employment was terminable only for cause. *See* Def.'s MSJ, ECF No. 33 at 5 n.1, 6.

ECF No. 33-6 at 1, § 1.01 (emphasis added). WMATA Employees were "responsible for familiarizing themselves and observing *all* [WMATA] rules, *policies*, guidelines, and procedures, satisfactorily perform the duties and responsibilities of their position and to understand the performance expectation for the position." *Id.* at 1, § 3.02 (emphasis added). Where an employee's job performance or conduct became "less than full satisfactory," the employee was subjected to the following disciplinary actions: (1) oral warning, (2) written warning, (3) suspension, (4) disciplinary demotion, (5) dismissal. *Id.* at 2-4, § 4.02(a). The Disciplinary Actions Policy used the terms "dismissal" and "termination" interchangeably. *See id.* at 1-4. Termination was warranted "if there [were] any further instances of unacceptable job performance and/or conduct after an employee return[ed] from suspension[.]" *Id.*

Generally, the Disciplinary Actions Policy was progressive because suspension was a precondition for termination. *See, e.g.*, *id.* at 4 § 4.02(a)(5); *id.* at 3 § 4.02(a)(3) ("[A] written warning, or warnings, will be issued prior to taking the disciplinary action of suspension."); Sexual Harassment Policy, ECF No. 33-4 at 3 (employees were subjected to "progressive discipline" for sexual harassment); Nepotism/Favoritism Policy, ECF No. 33-5 at 3 (employees were subjected to "discipline, up to and including termination").

13

WMATA, however, had discretion to deviate from the progressive disciplinary policy under Section 4.02(a)(5). Disciplinary Actions Policy, ECF No. 33-6 at 4 § 4.02(a)(5). That section provided: "[I]mmediate dismissal may also result if the severity of the inappropriate behavior or conduct [was] such that immediate management action [was] necessary with or without a prior record of oral or written warnings or suspension(s)." *Id.* at 4 § 4.02(a)(5). In other words, an employee could have been terminated without suspension. *See id.*

Finally, a terminated employee had an opportunity to be heard before his termination, if circumstances permitted it. *See id.* ("If circumstances do not permit a written response by the employee prior to his [or] her last day at work, a dismissed employee may file a grievance under [the Employee Dispute Resolution Policy] within the time limit provided in that policy."). And the terminated employee was entitled to WMATA's employee dispute resolution process to contest his termination. *Id.* The latter is relevant here because Mr. Battles challenges this process. *See* Pl.'s MSJ, ECF No. 34 at 1.

### 3. Employee Dispute Resolution Policy

A terminated employee, like Mr. Battles, was entitled to WMATA's employee dispute resolution process. *See* Def.'s SOMF, ECF No. 33-1 ¶ 5; *see also* Pl.'s SOMF, ECF No. 34 ¶ 4. The Employee Dispute Resolution Policy provided that an employee

14

could submit a "formal grievance challenging an action which result[ed] in an economic loss in current wages, salary, and/or leave by the employee." Employee Dispute Resolution Policy, ECF No. 33-7 at 1 § 3.01(a) (emphasis in original), 2 §§ 4.03, 5.01. While "disciplinary actions associated with the resolution of [sexual harassment] complaints" were ineligible for review under the policy, *id.* at 1 § 2.02(c), an employee was eligible for review of his dismissal by submitting a formal "Adverse Action Grievance" within the prescribed time limits to the Chief Human Resources Officer. *Id.* at 1 § 3.01(a), 3-6.

After a terminated employee filed a timely grievance, the Chief Human Resources Officer had to acknowledge it, submit it to the General Manager, and the General Manager would designate a "disinterested Officer or Department Head" to review the grievance and render a decision. *Id.* at 6. The Employee Dispute Resolution Policy made clear that "***[t]his decision is administratively final.***" *Id.* (emphasis in original).

Upon review of the relevant policies, the Court concludes that the plain language of those policies demonstrates that there was an implied contract between Mr. Battles and WMATA. It is clear that: (1) the relevant policies were "intended by [WMATA] to govern the rights and responsibilities of [WMATA]" and Mr. Battles; and (2) the actions of WMATA and Mr. Battles showed an intent to be bound by the terms in those policies.

*Strass*, 744 A.2d at 1013 (language in employer's policy manual may form an implied contract between employer and employee); *see also Duffy v. Duffy*, 881 A.2d 630, 637 (D.C. 2005) (parties' actions may demonstrate mutual assent to the contract terms).

Here, the written policies supply proof of the parties' agreement to the terms therein. *See Ekedahl v. COREStaff, Inc.*, 183 F.3d 855, 858 (D.C. Cir. 1999) ("Proof of a meeting of the minds may be found . . . in the written agreement[.]"). The parties also demonstrated their mutual assent to the terms of the relevant policies because Mr. Battles took advantage of the employee dispute resolution process by submitting a formal grievance. *See* Battles' Grievance, ECF No. 33-10 at 1-10. WMATA's Chief Human Resources Officer acknowledged receipt of his grievance and later assigned a reviewing officer for the administrative review. *See* Letter from Tawnya Moore-McGee, Chief Human Res. Officer, to Mr. Battles (Jan. 21, 2016), ECF No. 33-11 at 1). The reviewing officer rendered a final administrative decision and accepted the underlying rationale for termination. *See* Mem. from Shiva Pant to Tawnya Moore-McGee, Chief Human Res. Officer (Feb. 19, 2016), ECF No. 33-12 at 1. Accordingly, it is clear that there was an implied contract between WMATA and Mr. Battles based on their respective rights and obligations as set forth in the relevant policies. *See McConnell v. Howard Univ.*, 818 F.2d 58, 62-63 (D.C. Cir. 1987) ("It is well established

16

that, under District of Columbia law, an employee handbook . . .
defines the rights and obligations of the employee and the
employer, and is a contract enforceable by the courts.").

### B. **WMATA Is Entitled to Summary Judgment as to Mr. Battles' Breach of Contract Claim**

Having found that there was an implied contract between
WMATA and Mr. Battles, the Court concludes that the cross-
motions do not present genuinely disputed material facts that
would preclude a grant of summary judgment in this case.
Mr. Battles acknowledges that there is no dispute as to the
existence of a contract. Pl.'s MSJ, ECF No. 34 at 5. But he
contends, in the alternative, that "there obviously exist
genuine issues of material fact[.]" *Id.* at 8.

The law in this Circuit is clear: "[I]f there is no dispute
as to what occurred between the parties, then whether the agreed
facts brought an enforceable contract into existence is a
question of law for the court." *C. Robert Suess v. Fed. Deposit
Ins. Corp.*, 770 F. Supp. 2d 32, 43 (D.D.C. 2011); *see also Nat'l
R.R. Passenger Corp. v. Bos. & Maine Corp.*, 850 F.2d 756, 764
n.5 (D.C. Cir. 1988) (noting that there were no genuine issues
of material fact where the parties agreed to the existence of
the agreement). In this case, there are no genuine issues of
material fact as to whether WMATA breached the contract because
the parties do not dispute the material facts or the existence

of a contract. *See generally* Def.'s MSJ, ECF No. 33; Pl.'s MSJ, ECF No. 34; Def.'s Reply, ECF No. 38.

Neither is there a dispute that Mr. Battles was entitled to the grievance process provided in the Employee Dispute Resolution Policy. WMATA fulfilled its obligations under said policy. He, therefore, cannot establish an essential element for his claim: breach. *See Mendez*, 984 A.2d at 187 (discussing the elements of breach of contract). Instead, he makes two arguments to support his position that his termination was "false" and "pretextual." *See* Pl.'s MSJ, ECF No. 34 at 4. First, he maintains that he did not violate the Nepotism/Favoritism Policy because WMATA "cannot point to one instance of favoritism bestowed upon the female subordinate employee accuser" and WMATA admitted that Ms. Gaines-Kelsey's five-day suspension was warranted. *Id.* at 7. Next, he argues that his termination cannot be based on his violation of the Sexual Harassment Policy because he was "exonerated" of the "complaint of sexual harassment[.]" *Id*.

WMATA responds that Mr. Battles ignores WMATA management's determination that his "behavior toward two other female subordinates, coupled with his poor judgment of having a sexual relationship with another subordinate, justified his termination based on" his violations of the Sexual Harassment Policy and the Nepotism/Favoritism Policy. Def.'s Reply, ECF No. 38 at 3.

The Court is not persuaded by Mr. Battles' arguments. He has produced no evidence to support his position that WMATA's stated reasons for terminating him were false and pretextual. To the contrary, WMATA has presented sufficient evidence that Mr. Battles violated both the Sexual Harassment Policy and the Nepotism/Favoritism Policy.

### 1.  The Nepotism/Favoritism Policy Violation

Mr. Battles' argument—that his consensual sexual relationship with Ms. Gaines-Kelsey cannot support a violation of the Nepotism/Favoritism Policy—demonstrates his fundamental misunderstanding of that policy. Section 5.01 of the Nepotism/Favoritism Policy provides:

> Employees who are . . . *close associates* are permitted to work in the same Metro unit or work location *provided no direct reporting or supervisory/managerial relationship exists between them* that would allow either employee to *exert influence* over the other regarding work assignment, compensation, benefits, overtime or compensatory time assignments, or career progress in general.

Nepotism/Favoritism Policy, ECF No. 33-5 at 2, § 5.01 (emphasis added).[6] By his own words, this action involves "an approximately

---

[6] The term "Close Associates" means employees who "have or had a close personal . . . relationship with the human resources management decision maker of such a nature or intimacy as to impair, or give the appearance of impairing, the decision maker's ability to exercise independent and unbiased judgment toward such employees or applicants." Nepotism/Favoritism Policy, ECF No. 33-5 at 1-2, § 3.04.

two month long consensual sexual relationship between
[Mr. Battles] and a subordinate female employee." Pl.'s MSJ, ECF
No. 34 at 3. The Court cannot ignore his own admissions of fact
that he was "involved in a consensual sexual relationship with
one of his subordinate female employees." Compl., ECF No. 1 ¶ 9;
*see also El Paso Nat. Gas Co. v. United States*, 750 F.3d 863,
876 (D.C. Cir. 2014) ("[F]actual allegations in operative
pleadings are judicial admissions of fact.").

Moreover, WMATA's documentary evidence demonstrates that
Ms. Gaines-Kelsey admitted that her sexual relationship with
Mr. Battles was consensual, and they exchanged nude pictures
during their relationship. Investigative Report, ECF No. 33-9 at
6. Therefore, the Court agrees with WMATA that Mr. Battles
violated Section 5.01 because he engaged in a "close personal
relationship" of a sexual nature with a "close associate" whom
he supervised. *See* Nepotism/Favoritism Policy, ECF No. 33-5 at
1-2, §§ 3.04, 5.01.

The Court is persuaded by WMATA's argument that Mr. Battles
violated Section 5.02 of the Nepotism/Favoritism Policy, which
states that "[e]mployees who are . . . close associates must
avoid even indirect influences over each other's work or work-
related activity. Examples of this include . . . evaluation or
review of disciplinary circumstance[.]" *Id.* § 5.02. It is
undisputed that Mr. Battles was a supervisor who disciplined

Ms. Gaines-Kelsey, and he could have exerted his influence over her "disciplinary circumstance" because managers, like him, were tasked with ensuring that their subordinates adhered to the applicable policies, including the Absenteeism Policy and the Disciplinary Actions Policy. *See* Investigative Report, ECF No. 33-9 at 6 ("[F]or a first offense to [the Absenteeism] policy, supervisors must deny pay and provide a written warning to the employee who fail[s] to provide timely a completed doctor's certification for an absence whatever duration.").

WMATA correctly points out that Mr. Battles ignores the definition of "close associates" when he argues that he did not violate the Nepotism/Favoritism Policy because he was in "no way related—not by blood, lineage, or marriage"—to Ms. Gaines-Kelsey. *See* Pl.'s MSJ, ECF No. 34 at 7; *see also* Def.'s Reply, ECF No. 38 at 3. He contends that WMATA "cannot point to one instance of favoritism" to show that he was in violation of the Nepotism/Favoritism Policy. Pl.'s MSJ, ECF No. 34 at 7. Although "favoritism" is a defined term under the policy, WMATA was not required to show that Mr. Battles offered a favor to Ms. Gaines-Kelsey under the policy because an employee violated the Nepotism/Favoritism Policy if: (1) the supervisor exerted influence over a close associate as outline in Section 5.01; and (2) the supervisor did not avoid indirect influence over the close associate as provided in Section 5.02. *See*

Nepotism/Favoritism Policy, ECF No. 33-5 at 2, §§ 5.01, 5.02.

Mr. Battles' other argument is unavailing. He contends that WMATA breached its obligations under the relevant policies because he "never received any notice, verbal or in writing, for having violated the [Nepotism/Favoritism Policy]; and therefore, was not afforded an opportunity for redress through the established Employee Dispute Resolution process." Pl.'s MSJ, ECF No. 34 at 7. WMATA correctly points out that Mr. Battles asserts a new claim regarding his alleged "lack of notice" for the nepotism/favoritism charge for the first time in his cross-motion. *See, e.g.*, Def.'s Reply, ECF No. 38 at 3; Pl.'s MSJ, ECF No. 34 at 4 ("[WMATA] failed to accord him due process on the charge of Nepotism/Favoritism as their stated cause for terminating his employment."); Pl's SOMF, ECF No. 34 at 10 ¶ 8 ("No written notice or verbal, of the charge of nepotism/favoritism was presented to [him].").

Although Mr. Battles alleges that he was unaware of the Nepotism/Favoritism Policy and the charge of that policy, *see* Compl., ECF No. 1 ¶¶ 23-24, Mr. Battles did not assert a due process claim in his complaint. *See generally* Compl., ECF No. 1. Accordingly, the Court will not consider this new claim at this advanced stage of the litigation. *See, e.g.*, *Teltschik v. Williams & Jensen*, *PLLC*, 683 F. Supp. 2d 33, 41, 47-48 (D.D.C. 2010) (declining to entertain new allegations at the summary

judgment stage that were not raised in the complaint), *aff'd*, 748 F.3d 1285 (D.C. Cir. 2014)); *Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007) ("[A] plaintiff may not, through summary judgment briefs, raise the new claims[.]"). Finally, even if Mr. Battles had asserted a due process claim in his complaint, his own exhibit shows that OEEO sent him a letter before his termination to, among other things, "notify" him that his sexual relationship with Ms. Gaines-Kelsey was "inconsistent" with Sections 5.01 and 5.02 of the Nepotism/Favoritism Policy. Pl.'s Ex. 1, ECF No. 34-1 at 1.[7]

---

[7] Mr. Battles argues that WMATA "erroneously attempt[s] to treat" the Nepotism/Favoritism Policy violation as "some sort of lesser-including offense of sexual harassment." Pl.'s MSJ, ECF No. 34 at 6. He goes on to contend that "there are no lesser-including offense[s] in this kind of administrative process. This is not a criminal offense wherein a lesser-including offense could be considered by [a] trier of the facts." *Id.* Mr. Battles is mistaken for two reasons. First, plaintiffs have successfully put forward a lesser offense argument in the employment discrimination context. *See Gibbs v. Wash. Metro. Area Transit Auth.*, 48 F. Supp. 3d 110, 129 (D.D.C. 2014) (finding that a jury could infer discriminatory animus by a white supervisor's decision to initiate and investigate a more serious offense—falsification of data—for Black employees and a lesser offense—mere paperwork error—for white employees based on the same infraction). Second, Mr. Battles violated the Nepotism/Favoritism Policy based on his consensual sexual relationship with Ms. Gaines-Kelsey, *see* Def.'s Reply, ECF No. 38 at 2, and he separately violated the Sexual Harassment Policy based on his inappropriate conduct with a female employee in 2009. *See* Term. Ltr., ECF No. 33-3 at 1-2. Mr. Battles has failed to prove that WMATA treated one of his violations as a lesser offense.

## 2. The Sexual Harassment Policy Violation

Mr. Battles' "false" and "pretextual" arguments fail for an additional reason: Mr. Battles violated the Sexual Harassment Policy in 2009 for "ask[ing] a female employee what type of underwear she was wearing[.]" Investigative Report, ECF No. 33-9 at 6; *see also* Term. Ltr., ECF No. 33-3 at 1-2. Mr. Battles does not deny that this incident occurred. *See generally* Pl.'s MSJ, ECF No. 33. Neither does he contest the recommended suspension stemming from his violation. *See id.* The Sexual Harassment Policy prohibited all forms of sexual harassment, including "[p]ersistent sexual propositions and insults, innuendoes, jokes or gestures of a sexual nature; recurring uninvited and inappropriate physical contact; or repeated sexually-oriented comments." Sexual Harassment Policy, ECF No. 33-4 at 2. An internal investigation into a female employee's sexual harassment allegations found that he violated this policy. Term. Ltr., ECF No. 33-3 at 2. Mr. Battles offers no contradictory evidence.

\*     \*     \*

Mr. Battles has failed to prove that WMATA breached the implied contract. WMATA's decision to terminate Mr. Battles complied with the applicable policies due to his violations of the Nepotism/Favoritism Policy and the Sexual Harassment Policy. There is no question that WMATA's documentary evidence

demonstrates that Mr. Battles was terminated for cause because his "conduct" was "less than satisfactory." *See* Policy 7.2.1/1, ECF No. 33-13 at 3, § 5.01. As an employee, he was tasked with being familiar with all of the policies. *See* Disciplinary Actions Policy, ECF No. 33-6 at 1, § 3.02. In his supervisory position, he had the authority to enforce those policies. He was required to comply with all of them. He failed to do so. Therefore, the Court concludes that summary judgment should be granted to WMATA with respect to Mr. Battles' remaining breach of contract claim.

## IV.  Conclusion

For the reasons set forth above, the Court **GRANTS** WMATA's motion for summary judgment and **DENIES** Mr. Battles' cross-motion for summary judgment. A separate Order accompanies this Memorandum Opinion.

**SO ORDERED**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**March 21, 2019**